UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARC GOLDSCHEIN, Individually and On Behalf Of All Others Similarly Situated, | Case No. _____ |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | DEMAND FOR JURY TRIAL |
| AVANGRID, INC., ROBERT DUFFY, JOHN BALDACCI, PEDRO AZAGRA BLÁZQUEZ, and IGNACIO S. GALÁN, | VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 |
| Defendants. | |

Plaintiff Marc Goldschein ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel, publicly available information, and books and records obtained by Plaintiff pursuant to New York Business Corporation Law Section 624, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      Plaintiff brings this putative class action against Avangrid, Inc. ("Avangrid" or the "Company"), former directors Robert Duffy and John Baldacci (Governor of Maine from 2003-2011), former director and Chief Executive Officer Pedro Azagra Blázquez, and former director and Board Chairman Ignacio S. Galán (Duffy, Baldacci, Blázquez, and Galán together, the "Individual Defendants", and as to all defendants collectively, the "Defendants") for negligent violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a) and § 78t(a), and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9(a) ("Rule 14a-9").

2.      Plaintiff's claims arise in connection with Defendants' solicitation of the

Company's public stockholders to vote in favor of the transaction whereby Iberdrola, S.A. ("Iberdrola"), Avangrid's 81.6% owner and controlling stockholder, acquired the shares of Avangrid that it did not already own pursuant to an Agreement and Plan of Merger dated May 17, 2024 (the "Merger Agreement") for $35.75 in cash per share (the "Merger Consideration") (as to the transaction, the "Buyout").

3.    The proxy statements Avangrid filed with the Securities and Exchange Commission on Schedule 14A on August 20, 2024 and September 6, 2024 (collectively, the "Proxy") in furtherance of its solicitation contained numerous negligent omissions relating to Baldacci's long-standing and significant ties to Iberdrola.

4.    In particular, Plaintiff challenges the following statements as materially misleading insofar as they:

(a)    Related to the Unaffiliated Committee, yet negligently and falsely characterized the Unaffiliated Committee as independent from Iberdrola or failed to disclose material facts sufficient to reasonably apprise stockholders of the Unaffiliated Committee's lack of independence from Iberdrola; or

(b)    Related to Baldacci, yet negligently and omissively failed to disclose the existence of his relationship with Iberdrola or failed to disclose material facts sufficient to reasonably apprise stockholders of that relationship.

## Challenged Statement 1

(Proxy at 157)



**John Baldacci**

Director since 2014
*Vice Chair of the Board*
*Standing NECEC Committee Chair*
*Unaffiliated Committee*

Mr. Baldacci, 70, served as Senior Advisor for Economic Development & Government Relations at Pierce Atwood LLP from 2012 until May 2021. Mr. Baldacci served as the 73rd Governor of the State of Maine from 2003 until 2011. He previously served as Director of the U.S. Department of Defense's Military Health Care Reform Initiative from 2011 to 2012, and U.S. Representative for Maine's 2nd Congressional District from 1995 to 2003. Mr. Baldacci earned a B.A. in History from the University of Maine at Orono.

Among other qualifications, Mr. Baldacci brings senior leadership experience to the Board, including his service as the Governor of the State of Maine, along with extensive experience in economic development and government relations.

Selected directorships and memberships
Board of Directors, Jobs for America's Graduates

## Challenged Statement 2

(Proxy at 171)

### Unaffiliated Committee

The Unaffiliated Committee was established in accordance with the shareholder agreement, dated December 15, 2015, between Avangrid and Iberdrola, (the "Shareholder Agreement") and, among other things, is responsible for reviewing and approving all transactions entered into between the Company and Iberdrola, or its affiliates, and ensuring that such transactions are entered into on an arms' length basis. The Unaffiliated Committee operates under a written charter adopted by the board, which is available on the Company's website at www.avangrid.com. Ms. Jacobs and Mr. Baldacci currently serve on, and during 2023, served on the Unaffiliated Committee, with Mr. Duffy serving as the chair. The Unaffiliated Committee is comprised solely of "independent" directors. The Unaffiliated Committee held six meetings during 2023, with each of the committee members attending all of the meetings.

## Challenged Statement 3

(Proxy at 106)

### Interests of Avangrid's Directors and Executive Officers in the Merger

In considering the recommendation of the Board that you vote to adopt the Merger Agreement, you should be aware that aside from their interests as shareholders of Avangrid, Avangrid's directors and executive officers have interests in the Merger that may be different from, or in addition to, those of other shareholders of Avangrid generally. The members of the Unaffiliated Committee were aware of and considered these interests, among other matters, in evaluating and negotiating the Merger Agreement and the Merger, and in making its recommendations to the Board, which was also aware of and took into account these interests, among other matters, when making its recommendation to the shareholders of Avangrid that the Merger Agreement be adopted. See "*Special Factors—Background of the Merger*" beginning on page 43, "*Special Factors—Reasons for the Merger; Recommendation of the Unaffiliated Committee; Fairness of the Merger*" beginning on page 63 and "*Special Factors—Recommendation of the Board*" beginning on page 71.

---

### **Challenged Statement 4**

(Portion of Section Entitled "*Special Factors—Reasons for the Merger; Recommendation of the Unaffiliated Committee; Fairness of the Merger*" referenced within Challenged Statement III)
(Proxy at 66)

- The fact that the consideration and negotiation of the Merger Agreement was conducted through arm's-length negotiations by a special committee comprised entirely of disinterested and independent directors, who were fully empowered to say "no" definitively to any transaction and to take all actions the Unaffiliated Committee considered necessary or desirable in connection with examining and negotiating and making recommendations to the Board regarding the Initial Proposal and any alternative transactions;

---

### **Challenged Statement 5**

(Proxy at 167)

## Director Independence

Due to Avangrid's status as a "controlled company," we rely on certain exemptions from the rules of the NYSE that would otherwise require that our Board be comprised of a majority of "independent" directors as defined under the rules of the NYSE. Avangrid is required to have an "independent" audit committee under the NYSE's listed company requirements. See the section entitled "*Corporate Governance Items—Audit Committee*" for additional information.

The Board has undertaken a review of the independence of each director nominee. Based on this review, the board has determined that each of Mmes. Báñez García, Herbert, Jacobs, and Joseph Varlack and Messrs. Baldacci, Duffy, Lahey, and Solomont do not have a material relationship with the Avangrid group of companies (either directly or as a partner, shareholder, or officer of an organization that has a relationship with the Avangrid group of companies) and that each of these nominees is "independent" under the rules of the NYSE.

---

### **Challenged Statement 6**

(Proxy at 45)

Later on March 6, 2024, the Board held a special meeting via videoconference with all of the members of the Board and Mr. Mahoney in attendance. After discussion, including confirmation that the Unaffiliated Committee members could devote the time and attention to consider the Initial Proposal, and deliberation at the March 6 Board meeting, the Board delegated to the Unaffiliated Committee the full authority of the Board to examine, negotiate and evaluate the terms, conditions and advisability of a transaction involving the Company and Iberdrola or any other strategic transaction, including with a third party, to oversee negotiations of any such transaction, and to determine to elect not to pursue any such transaction. The Board also granted the Unaffiliated Committee the authority to engage, at the Company's expense, its own counsel, financial advisors and such other advisors as the Unaffiliated Committee deemed appropriate, to assist the Unaffiliated Committee in performing its functions. In delegating such authority to the Unaffiliated Committee, each of the members of the Unaffiliated Committee, Mr. Duffy, Governor John Baldacci and Ms. Patricia Jacobs, confirmed, and the Board determined, that each of them was unaffiliated with, and otherwise independent from, Iberdrola, and otherwise had no material interests or relationships that would impede his or her ability to continue to serve on the Unaffiliated Committee. The Board resolutions delegating the Unaffiliated Committee such authority also provided that the Board would not approve any strategic transaction that was not recommended by the Unaffiliated Committee.

---

## __Challenged Statement 7__

### (Proxy at 47)

On March 27, 2024, the Unaffiliated Committee held a meeting via videoconference with all members of the Unaffiliated Committee and representatives of Paul, Weiss in attendance. At that meeting, the Unaffiliated Committee and the Paul, Weiss representatives discussed the fiduciary duties of the members of the Unaffiliated Committee under New York law in considering any transaction with Iberdrola or a third party, including the fact that the Initial Proposal stated that any transaction between the Company and Iberdrola would be irrevocably conditioned on the approval of a majority of the issued and outstanding shares of Avangrid Common Stock not held by Iberdrola or its affiliates. <mark>Each of the members of the Unaffiliated Committee also confirmed that he or she was unaffiliated with, and otherwise independent from, Iberdrola, and otherwise disinterested with respect to a potential transaction involving Iberdrola.</mark> The

## __Challenged Statement 8__

### (Proxy at 61-62)

On May 17, 2024, the Unaffiliated Committee held a meeting via videoconference with all of the members of the Unaffiliated Committee, Paul, Weiss representatives and Moelis representatives in attendance. During the meeting, representatives of Paul, Weiss further reviewed with the Unaffiliated Committee the fiduciary duties of directors under New York law in considering any transaction with Iberdrola or a third party. The Unaffiliated Committee's advisors also reviewed with the Unaffiliated Committee the process that the Unaffiliated Committee had conducted to review and evaluate the Initial Proposal. <mark>At that meeting, each of the members of the Unaffiliated Committee reconfirmed that he or she was unaffiliated with, and otherwise independent from, Iberdrola, and otherwise disinterested with respect to a potential transaction involving Iberdrola.</mark>

## __Challenged Statement 9__

### (Proxy at 97)

Parent also believes that the transactions contemplated by the Merger Agreement, including the Merger, are procedurally fair to the unaffiliated security holders based on the following factors, which are not listed in any relative order of importance:

- <mark>all members of the Unaffiliated Committee during the Company's sale process were and are independent directors and were and are unaffiliated with Parent and none of such Unaffiliated Committee members is an employee of the Company or any of its subsidiaries or affiliates;</mark>

## __Challenged Statement 10__

### (DEFA14A filed Sept. 6, 2024, at 22)



**John Baldacci,** 70, served as Senior Advisor for Economic Development & Government Relations at Pierce Atwood LLP from 2012 until May 2021. Mr. Baldacci served as the 73rd Governor of the State of Maine from 2003 until 2011. He previously served as Director of the U.S. Department of Defense's Military Health Care Reform Initiative from 2011 to 2012, and U.S. Representative for Maine's 2nd Congressional District from 1995 to 2003. Among other qualifications, Mr. Baldacci brings senior leadership experience to the Board, including his service as the Governor of the State of Maine, along with extensive experience in economic development and government relations.

**Selected directorships and memberships:** Board of Directors, Jobs for America's Graduates

---

**Challenged Statement 11**

(*Id*. at 20)

**Robust Unaffiliated Committee Process** 

➤ The Unaffiliated Committee is comprised solely of independent and unaffiliated directors
  ○ At the outset of negotiating the proposed transaction, each member of the Unaffiliated Committee confirmed that they are
    unaffiliated with, and independent from, IBE, and disinterested with respect to a potential transaction involving IBE

---

5.      As detailed below, Baldacci possessed and maintained longstanding and thick ties with Iberdrola which were not disclosed in the Proxy, rendering the foregoing statements materially omissive and misleading.

6.      On March 7, 2024, Iberdrola submitted and publicly announced an opening unsolicited offer to acquire the remaining minority interest in Avangrid.

7.      Subsequently, the Unaffiliated Committee was charged with negotiating the terms of a potential transaction with Iberdrola, thereby (i) rendering the independence of its members from Iberdrola crucially relevant to its ability to negotiate a fair, arms-length transaction; and (ii) further rendering all facts pertaining to ties between Unaffiliated Committee member Baldacci highly material to Avangrid stockholders.

8.      On May 17, 2024, Avangrid and Iberdrola announced that Avangrid's Board had approved the Buyout pursuant to the Merger Agreement. As further discussed below, the Merger Consideration was inadequate and failed to provide stockholders fair value for their shares.

9.      On August 20, 2024 and September 6, 2024, Avangrid filed the Proxy with the SEC.

10.     On September 26, 2024, Avangrid held its shareholder vote in connection with the Buyout.

11.     Unaware of Baldacci's ties to Iberdrola, a majority of Avangrid's stockholders

voted in favor of the Buyout, which closed on December 23, 2024.

12.     Plaintiff seeks to recover damages that he and other similarly situated former Avangrid stockholders suffered as a result of Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

14.     Personal jurisdiction exists over each Defendant.

15.     Personal jurisdiction exists over Avangrid because it is a New York corporation. Further, Avangrid was listed on the New York Stock Exchange ("NYSE"), which is based in New York; utilized Moelis & Company LLC ("Moelis"), a New York-headquartered investment bank, as its financial advisor in connection with the Buyout; used Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), a New York-headquartered law firm, as its legal advisor in connection with the Buyout; Avangrid's stock transfer agent, Broadridge Corporate Issuer Solutions, Inc., was based in New York; and Avangrid's proxy solicitor for the challenged solicitation was Okapi Partners LLC, which is based in New York. Avangrid also possesses subsidiaries that operate in New York, including New York State Electric and Gas (NYSEG) and Rochester Gas and Electric (RG&E), and maintains approximately 2 million customers in New York. As to Individual Defendants Duffy, Baldacci, Blázquez, and Galán, they were directors and/or officers of the Company, which had extensive contacts with New York as set forth above. Additionally, upon information and belief, Duffy is a resident of New York State.

16.     Moreover, Section 27 of the Exchange Act "authorize[s] nationwide service of process on any individual named in the complaint, provided, of course, the complaint states a claim

under the 1934 Act." *Mariash v. Morrill*, 496 F.2d 1138, 1142 (2d Cir. 1974). Thus, the Exchange Act authorizes this court to exercise personal jurisdiction over a defendant who has minimum contacts with the United States.

17.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391(b)(3). Under 15 U.S.C. § 78aa, any suit or action to enforce any liability or duty created by the Exchange Act or rules and regulations thereunder may be brought in "the district wherein any act or transaction constituting the violation occurred" or "in the district wherein the defendant is found or is an inhabitant or transacts business[.]" *Id*. Here, Venue is proper in this District because a substantial portion of the acts or transactions constituting the violations at issue occurred in this District and Defendants are found in or inhabit or transact business in this District, as reflected by the above-referenced contacts and engagements Defendants had with New York-based entities and Duffy's alleged residence in New York. Further, Defendants have received substantial income in this District by doing business here and have engaged in numerous further activities that had an effect in this District.

## THE PARTIES AND RELEVANT NON-PARTIES

### A.    Plaintiff

18.    Marc Goldschein was, at all relevant times, a holder of Avangrid common stock.

### B.    Defendants

19.    Avangrid is New York corporation with principal executive offices located at 180 Marsh Hill Road, Orange, Connecticut. Prior to the consummation of the Buyout, the Company listed its common stock on the NYSE under the ticker symbol "AGR." Avangrid survived the Buyout as a wholly owned subsidiary of Iberdrola.

20.    Individual Defendant Robert Duffy was, at all relevant times, a director of the

Company and the chair of the Avangrid Board's Unaffiliated Committee ("Unaffiliated Committee").

21.     Individual Defendant John Baldacci was, at all relevant times, a director of the Company, Vice Chair of the Board, and a member of the Unaffiliated Committee. Baldacci was the Governor of Maine from 2003-2011 and a representative of Maine in the House of Representatives from 1995-2003. In the House of Representatives, he was a member, inter alia, of the Energy and Commerce Committee.

22.     Individual Defendant Pedro Azagra Blázquez was, at all relevant times, Avangrid's CEO and a director of the Company.

23.     Individual Defendant Ignacio S. Galán was, at all relevant times, Avangrid's Chairman. He is also the Executive Chairman of Iberdrola.

## SUBSTANTIVE ALLEGATIONS

### A.     Background of Avangrid and Iberdrola

24.     Avangrid is a utility company incorporated in New York and headquartered in Orange, Connecticut with operations across the United States. Its subsidiaries include New York State Electric and Gas (NYSEG), Rochester Gas and Electric (RG&E), Connecticut Natural Gas Corporation (CNG), The Southern Connecticut Gas Company (SCG), The United Illuminating Company (UI), The Berkshire Gas Company, Central Maine Power Company (CMP), and Maine Natural Gas Corporation (MNG). It maintains millions of customers across the east coast, including approximately 2 million customers in New York State.

25.     Iberdrola is a utility conglomerate incorporated under the laws of the Kingdom of Spain, with headquarters in Bilbao, Spain.

26.     In September 2008, Iberdrola acquired the U.S. utility holding company Energy East Corporation ("Energy East") in an all-cash transaction. The *pro forma* company was

reorganized as Iberdrola USA.

27.     In 2015, Iberdrola (through Iberdrola USA) acquired UIL Holdings Corp. ("UIL") in a mixed cash and stock transaction. After the transaction closed, the combined company was renamed Avangrid, and UIL shareholders maintained an 18.5% minority interest in the company.

28.     That *pro forma* company was renamed Avangrid, Inc.

29.     After the 2015 merger, Iberdrola cemented its control over Avangrid in a plethora of ways.

30.     First, Iberdrola locked in core control mechanisms over Avangrid using a shareholder agreement executed in 2015 in connection with the UIL merger (the "Shareholder Agreement"). Under its terms, Iberdrola possessed prerogatives such as (i) preemptive rights to maintain its ownership percentage of Avangrid in the event of effectively any issuance and sale of stock by the Company that would otherwise dilute Iberdrola's controlling stake; (ii) extensive board composition rights, such as the right to designate director nominees, including for seats reserved for purportedly "independent" directors, the right to fill any board vacancy, and the right to change the size of Avangrid's Board; and (iii) wide-ranging information rights concerning Avangrid's ongoing operations.

31.     Second, Iberdrola stacked the Board with directors beholden to Iberdrola, including in key positions and committees such as the Unaffiliated Committee established pursuant to the Shareholder Agreement. Until 2021, a majority of Avangrid's 14 member board consisted of directors affiliated with Iberdrola. Just below a majority of the Board remained affiliated with Iberdrola at the time of the Buyout.

32.     Prior to the consummation of the Buyout, the Board's Chairman was Galán, the Executive Chairman of Iberdrola. As part of his role with Iberdrola, he also chaired the boards of

Iberdrola's country-specific sub-holding companies for the U.K. and Brazil.

33.    The Board's Vice Chairman was Baldacci, who Avangrid claimed was independent during the Buyout but was explicitly identified by Avangrid in its annual proxy statements as *non-independent* until 2022:

## Director Nominees

| Name | Age | Independent | Director Since | Committee Memberships |
|---|---|---|---|---|
| Ignacio S. Galán (Board Chair) | 70 | | 2014 | • Executive |
| John Baldacci (Board Vice Chair) | 66 | | 2014 | |
| Dennis V. Arriola | 60 | | 2020 | • Executive |
| Daniel Alcaín López | 47 | | 2020 | |
| Pedro Azagra Blázquez | 52 | | 2019 | • Executive |
| Robert Duffy | 66 | ✓ | 2019 | • Unaffiliated |
| Teresa Herbert | 59 | ✓ | 2019 | • Audit and Compliance |
| Patricia Jacobs | 57 | ✓ | 2019 | • Compensation, Nominating and Corporate Governance<br>• Unaffiliated |
| John Lahey | 74 | ✓ | 2015 | • Compensation, Nominating and Corporate Governance<br>• Executive<br>• Unaffiliated |
| José Ángel Marra Rodríguez | 54 | | 2020 | |
| Santiago Martinez Garrido | 52 | | 2015 | |
| José Sáinz Armada | 61 | | 2014 | • Compensation, Nominating and Corporate Governance<br>• Executive |
| Alan Solomont | 72 | ✓ | 2014 | • Audit and Compliance |
| Elizabeth Timm | 67 | ✓ | 2016 | • Audit and Compliance |

## Director Qualifications and Experience

The following chart reflects areas of qualifications and experience that our board views as important when evaluating director nominees. The compensation, nominating and corporate governance committee and our board believe that each director nominee brings to our board his or her own unique background and range of expertise, knowledge, and experience, including as a result of his or her valued service on our board and its committees, that provide our board as a whole with an appropriate and diverse mix of qualifications, skills, and attributes necessary for our board to fulfill its oversight responsibility to our shareholders. Each director nominee also contributes other important skills, expertise, experience, and personal attributes to our board that are not reflected in the chart below.

| Director | Senior Leadership | Risk Management | Government / Regulatory | Finance / Financial Disclosure / Accounting | Environmental / Industry | NYSE Independent | Audit Committee Financial Expert | Diverse | Other Public Company Directorships |
|---|---|---|---|---|---|---|---|---|---|
| Ignacio S. Galán | • | • | • | | • | | | | 2 |
| John Baldacci | • | | | | | | | | 0 |
| Dennis V. Arriola | • | • | • | • | • | | | • | 0 |
| Daniel Alcaín López | • | • | | • | • | | | | 1 |
| Pedro Azagra Blázquez | • | | | • | • | | | | 1 |
| Robert Duffy | • | • | • | • | | • | | | 0 |
| Teresa Herbert | • | • | • | • | | • | • | • | 1 |
| Patricia Jacobs | • | • | • | • | | • | | • | 0 |
| John Lahey | • | | • | • | | • | | | 1 |
| José Ángel Marra Rodríguez | • | • | | • | • | | | | 1 |
| Santiago Martinez Garrido | • | • | • | | • | | | | 1 |
| José Sáinz Armada | • | • | | • | • | | | | 1 |
| Alan Solomont | • | | • | • | | • | | | 0 |
| Elizabeth Timm | • | • | | • | | • | • | • | 0 |

2021 Proxy Statement at pp. 4, 12 (April 16, 2021).

34.     As further discussed below, but undisclosed in the Proxy, Baldacci—who was a member of the Unaffiliated Committee which negotiated the Buyout with Iberdrola—possessed and maintained deep ties to Iberdrola.

35.     Third, Iberdrola ran Avangrid as part of Iberdrola's overall business operations, which Iberdrola and Avangrid call a "One Corporation" structure. This operational enmeshment between Iberdrola and Avangrid reached nearly all of Avangrid's ordinary business functions, including building management, building maintenance, facility security, human resources, brand management, procurement, IT system management, quality control, and general administration. Since June 2022, Avangrid's CEO was also Iberdrola affiliate Blázquez.

36.     Avangrid has never denied that Iberdrola was its controller, describing itself as a "controlled company" within the meaning of the New York Stock Exchange's listing rules and stating that it is "a member of the group of companies controlled by Iberdrola".

**B.     Governor Baldacci's Ties to Iberdrola**

37.     The Shareholder Agreement between Avangrid and Iberdrola provided for the creation of a three-member Unaffiliated Committee that would, among other things, oversee any privatization of Avangrid by Iberdrola. Prior to the Buyout, its members were Baldacci, Robert Duffy (former Lieutenant Governor of New York from 2011-2014), and Patricia Jacobs (a former congressional aide to senator Edward Markey, D-MA). Notwithstanding the committee's misleading moniker, it was not independent from Iberdrola.

38.     Notably, the Shareholder Agreement was expressly crafted to allow membership of the Unaffiliated Committee by certain directors regardless of their genuine independence, expressly including Baldacci.

> "Unaffiliated Committee" means a committee of the Company Board comprised solely of Independent Directors; provided, however, that Mr. Arnold L. Chase, for so long as he is a Director, shall be permitted to serve as a member of the

Unaffiliated Committee *irrespective of whether he qualifies as an Independent Director hereunder.*

* * *

**Section 5.1** (Board Representation).
(b) (i) For a period of five (5) years after the Closing, the Company Board shall consist of at least five (5) Independent Directors; provided that, solely for the purposes of this Section 5.1(b)(i), *each of Mr. John E. Baldacci and Mr. Arnold L. Chase, to the extent he is a Director during such period, shall be deemed an "Independent Director" irrespective of whether he qualifies as an Independent Director hereunder.*
(ii) Following the five (5)-year period described in Section 5.1(b)(i) above, the Company Board shall consist of at least four (4) Independent Directors provided that, solely for the purposes of this Section 5.1(b)(ii), *either Mr. Baldacci or Mr. Chase (but not both), to the extent he is a Director during such period, shall be deemed an "Independent Director" irrespective of whether he qualifies as an Independent Director hereunder.*

39.     The agreement thus confirms that Baldacci was *handpicked by Iberdrola* as someone that it wanted to serve as a director of Avangrid. It further confirms that—irrespective of Balducci's lack of independence from Iberdrola—Avangrid decided that it would continue to artificially "deem" Baldacci an "independent director."

40.     Iberdrola appointed Baldacci to the board of Iberdrola USA in 2014, prior to Iberdrola USA's acquisition of UIL. As stated above, he was Governor of Maine for nearly a decade (2003-2011) and was also previously one of Maine's two representatives in the House of Representatives (1995-2003), where he was a member, inter alia, of the Energy and Commerce Committee.

41.     Baldacci began cultivating his relationship with Iberdrola during his governorship in the late 2000s, subsequent to Iberdrola's 2008 acquisition of Energy East, which in turn owned Central Maine Power ("CMP"), a primary utility company in the state.[1]

42.     In public comments, Iberdrola described the acquisition as part of its focus on

---

[1] Other utility companies owned by Energy East Corp. included Berkshire Gas Co., Connecticut Natural Gas Corp., New York State Electric & Gas Corp., Rochester Gas and Electric Corp., and The Southern Connecticut Gas Co.

energy markets with stable growth prospects, and Baldacci described himself as "cautiously optimistic" about the transaction after discussions with CMP's then-CEO Sara Burns.

43.     In a radio address on September 26, 2009, Baldacci stated:

"This week, I led a Renewable Energy Trade Mission to Spain and Germany, and also visited a deep-water offshore wind platform in Norway. Spain and Germany and the United States lead the world in the production of wind turbines and installed wind power. By the end of 2008, 11 and a half percent of Spain's electricity production was coming from wind. And the country has set aggressive goals in building on that capacity. In addition, Spain is the home of Iberdrola, which owns Energy East and Central Maine Power. Iberdrola is one of the largest wind power operators in the United States and has plans to more than triple its capacity by 2012. The country offers great potential as a source of investment in Maine and as a market for technologies that will be developed and tested here."

* * *

"On the trip last week, I worked to spread the word that Maine is the place to conduct renewable and wind energy business."

https://digitalmaine.com/ogvn_audio/226/ (Governor John Baldacci's Weekly Radio Address: Trade Mission) (Sept. 26, 2009)

44.     During the trade mission, Baldacci met with Iberdrola executives and toured Iberdrola's "CORE" operations center in Toledo, Spain.



Iberdrola COO of international operations Amparo Moraleda and Baldacci
(Left to Right) (Sept. 21, 2009)

- 14 -



Baldacci tours Iberdrola CORE operations center in Toledo, Spain (Sept. 21, 2009)



Baldacci with trade mission members (Sept. 24, 2009)

45.     After returning from the trade mission, Baldacci indicated that he intended to support legislation easing investment and ownership regulations applicable to Iberdrola, specifically by changing local regulations to allow Iberdrola to invest in wind generation and distribution assets through CMP.

46.     The following year, on June 3, 2010, Baldacci also announced a new Foreign Direct Investment Initiative. According to a press release by his office, "several investment groups" had

visited Maine thus far since his September 2009 trade mission in Spain and Germany. *See* 2010 Archive of Governor Baldacci's Press Releases, p. 191 (*Governor Unveils New Investment Initiative*, June 3, 2010) ([https://digitalmaine.com/cgi/viewcontent.cgi?article=1016&context=ogvn_docs](https://digitalmaine.com/cgi/viewcontent.cgi?article=1016&context=ogvn_docs)).

47.    The following week, on June 10, 2010, the Maine Public Utilities Commission approved a CMP project to update and expand its transmission systems in Maine, which included a contested plan to construct approximately 450 miles of new transmission lines and five new substations over a five-year period. Pierce Atwood LLP ("Pierce Atwood") represented CMP in connection with the regulatory proceedings concerning the project.

48.    As discussed further below, Baldacci would later join Pierce Atwood as a lobbyist and advisor, with the title of Senior Advisor for Economic Development and Government Relations.

49.    On June 15, 2010, following the Utility Commission's approval of the CMP transmission project, Galán met with Baldacci in Augusta, Maine.

50.    In a subsequent press release at the end of the year, Baldacci confirmed that investment groups from Spain had visited and described his Foreign Direct Investment Initiative as an active solicitation effort intended to aggressively pursue foreign direct investment:

> Governor Baldacci outlined early progress of the "Invest in Maine" initiative announced earlier this year. The initiative seeks to *aggressively pursue foreign direct investments*. "We have brought together business leaders and stakeholders to move an international investment strategy forward, attracting capital to Maine to continue research, investment and economic growth," said the Governor.
>
> "We launched the initiative by tying in the expertise and connections of the Maine International Trade Center with the support of private donors and the Maine Technology Institute."
>
> *"Invest in Maine" will actively solicit international business leads to connect investors to specific opportunities in the State*. The initiative will also position Maine as a leading destination for advanced materials and renewable energy technology investments.
>
> The initiative began in September with the hiring of an Investment Attaché, who

recently returned from a series of meetings with industry leaders in Japan and South Korea. Meeting in those countries focused on Maine's renewable energy successes and manufacturing and logistics capacities. *Investment groups from Spain*, France, Germany and Norway *have also visited the State in recent months*.

*Id.* at 345. *Governor Celebrates "Invest in Maine" Initiative*, Dec. 1, 2010.

51.    Later that year, on September 28, 2010, Baldacci attended an Iberdrola public relations event in Portland with Galán and other Iberdrola affiliates intended to tout Iberdrola as breaking ground on the transmission system upgrade project which the Maine Public Utilities Commission had approved in June. There, Baldacci commended CMP (i.e., Iberdrola) as "a valuable corporate partner" of the state and praised "Iberdrola['s] invest[ments] in critical infrastructure and … energy technology" as "essential to Maine's economy and preserving [Maine's] quality of life."



Baldacci and Galán at PR event touting start of work on transmission upgrade project (Left to Right) (Sept. 28, 2010)



(Same event)



(Same event)

52.     In 2012, after leaving office as Governor, Baldacci built on his relationship with Iberdrola and joined Pierce Atwood's economic development and government relations group as a lobbyist and advisor. The firm maintains practice groups in Government Relations and Lobbying,

Energy Infrastructure Project Development & Finance, and Energy.[2]

53.    In January 2014, while at Pierce Atwood, Baldacci was appointed by Iberdrola as a director of Iberdrola USA. He then became a Vice Chairman of Avangrid's Board when Iberdrola USA acquired UIL in 2015, which was subsequently renamed Avangrid as discussed above.

54.    Importantly—and undisclosed to shareholders—Pierce Atwood possessed close ties with Iberdrola, of which Baldacci's cross-hiring by Avangid (i.e., Iberdrola) was just one manifestation. Avangrid and Iberdrola have paid Pierce Atwood at least approximately $20 million over the years, including but not limited to publicly disclosed annual payments totaling $1.7 million in 2015, $2.3 million in 2016, $3.9 million in 2017, $3.5 million in 2018, $3.2 million in 2019, $2.9 million in 2020, and $3.5 million in 2021. Avangrid ceased disclosing its total annual payments to Pierce Atwood after Baldacci left his role with the firm in 2021.

55.    Pierce Atwood's services to the Company have included litigating Maine's Act to Prohibit Campaign Spending by Foreign Governments, which stands to restrict Iberdrola's ability to fund efforts to influence elections and referendums in Maine.

56.    In a similar vein, Baldacci received over $1.6 million in cash compensation from Avangrid (i.e., Iberdrola) prior to the Buyout. Notably, significant portions of Baldacci's compensation included payments unique to him that meaningfully exceeded compensation paid to other directors. These additional payments were not explained in the Company's proxy for 2015, but were described in later proxies as ostensibly based upon Baldacci's specific role as Vice Chairman (2016-2023) and committee memberships (2023). He was also a highest paid director of the Company for almost all of the below years.

---

[2] Government Relations & Lobbying | Pierce Atwood; Energy Infrastructure Project Development & Finance | Pierce Atwood; Energy Law - Energy Legal Matters | Pierce Atwood

| <u>Year</u> | <u>Annual cash payments for directorship</u> |
|---|---|
| 2023 | $240,000 (including $40,000 Vice Chair retainer and $30,000 for committee memberships) |
| 2022 | $200,000 (including $60,000 Vice Chair retainer) |
| 2021 | $200,000 (including $60,000 Vice Chair retainer) |
| 2020 | $200,000 (including $60,000 Vice Chair retainer) |
| 2019 | $200,000 (including $60,000 Vice Chair retainer) |
| 2018 | $200,000 (including $60,000 Vice Chair retainer) |
| 2017 | $200,000 (including $60,000 Vice Chair retainer) |
| 2016 | $150,000 (including $40,000 Vice Chair retainer) |
| 2015 | $100,000 (including $20,000 additional unique payment) |

**C.    Defendants Issue the Materially False, Misleading, and Omissive Proxy**

57.    On August 20, 2024 and September 6, 2024, Defendants issued the Proxy, which contained the materially false and omissive statements identified above. By describing Baldacci's prior professional experience and touting his *purported* disinterestedness, independence, and lack of affiliation with Iberdrola, but omitting any mention of his long-standing ties to Iberdrola, Avangrid's past identification of him as a non-independent director in corporate filings, and Pierce Atwood's deep relationship with Avangrid and Iberdrola, the challenged statements were materially false or misleading. Indeed, the Proxy left shareholders with the *false* impression that one of the key fiduciaries charged with negotiating on their behalf and protecting their interests was "unaffiliated with, and otherwise independent from, Iberdrola, and otherwise had no material interests or relationships" with Iberdrola.

D.    **Loss Causation: Avangrid Stockholders Suffered Losses as a Result of the Materially False, Misleading, and Omissive Statements in the Proxy**

58.    The Proxy caused Avangrid stockholders economic loss by inducing them to accept a sale that underpriced their shares. Moreover, since the Buyout could not have occurred without the approval of Avangrid's minority shareholders, the Proxy was an essential link in the accomplishment of the Buyout and the misleading statements were the cause of the Class's economic loss.

59.    If Avangrid shareholders had not been deceived by the above-referenced materially false and misleading statements and had been accurately informed of, inter alia, Baldacci's affiliation with Iberdrola, the Unaffiliated Committee's lack of independence, and the Unaffiliated Committee's inability to negotiate a fair and arms-length transaction on behalf of Avangrid stockholders, then stockholders would not have voted to approve the Buyout at the unfair price of $35.75 offered by Iberdrola, which would have caused Iberdrola to increase its offer or enabled stockholders to keep their shares in a Company whose value was greater than the price paid in the Buyout. Under any scenario, shareholders would have obtained or maintained greater value than the price they received for their shares.

60.    Additionally, the Company's stand-alone plan offered shareholders greater value than the Merger Consideration. Indeed, Moelis's valuation analyses in the transaction indicated that Avangrid was worth up to $46.39 per share under a discounted cash flow ("DCF") analysis, $46.48 per share under on a selected publicly traded companies analysis, and $62.81 under a selected precedent transactions analysis. Similarly, Morgan Stanley & Co. LLC ("Morgan Stanley"), financial advisor to Iberdrola, valued the Company at up to $42.50 per share in an unlevered DCF analysis, $46.75 in a sum-of-the-parts DCF analysis, $46.50 in a precedent premiums analysis, and $43.00 in trading comparables analyses. Moreover, price targets for

- 21 -

Avangrid prior to the Buyout ranged up to $52.00 per share.

61.    Further, Avangrid stockholders received far lower premiums than stockholders of Energy East and UIL, even though the Iberdrola's acquisition of Avangrid completed its purchase of largely the same underlying business assets and operations. When Iberdrola acquired Energy East, Iberdrola paid Energy East's public stockholders a 26% premium relative to Energy East's unaffected pre-announcement stock price. Similarly, Iberdrola paid UIL's stockholders a 24.6% premium to UIL's unaffected pre-announcement stock price when it acquired its majority interest in the company. In contrast, Avangrid's stockholders—who essentially became minority owners of the combined former UIL and former Energy East—received a far lower 11.4% premium relative to the Company's last unaffected closing price prior to the announcement of Iberdrola's unsolicited offer.

62.    At bottom, if shareholders had not been misled by the Proxy and had instead been forthrightly informed of the material facts concerning Baldacci's affiliation with Iberdrola and the Unaffiliated Committee's resulting lack of independence and conflicts of interest, they would not have approved the transaction, which was financial unfair to them.

## **CLASS ACTION ALLEGATIONS**

63.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and all other similarly situated former public stockholders of Avangrid who held shares as of the August 19, 2024 record date for voting on the Buyout and who had their shares exchanged for the Merger Consideration (the "Class"). Excluded from the Class are: (i) the Individual Defendants and members of their immediate family; (ii) all other officers and directors of the Company and members of their immediate families; and (iii) any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

64.    This action is properly maintainable as a class action because:

(a)    The Class is so numerous that joinder of all members is impracticable. As of the August 19, 2024 record date to vote on the Buyout, there were 387,010,149 shares of Avangrid common stock outstanding and entitled to vote, held by hundreds to thousands of individuals and entities dispersed throughout the country. The actual number of former public stockholders of the Company will be ascertained through discovery;

(b)    There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including: (i) whether Defendants misrepresented or omitted material information from the Proxy in violation of Section 14(a) of the Exchange Act; (ii) whether the Individual Defendants violated Section 20(a) of the Exchange Act; and (iii) whether the Class suffered damages.

(c)    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications

with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

(f)    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## CLAIMS FOR RELIEF

### COUNT I
### Against all Defendants
### for Violations of Section 14(a) of the Exchange Act

65.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

66.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

67.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any

material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

68.     Defendants issued the Proxy and/or permitted the use of their names in the Proxy with the intention of soliciting shareholders' support for the Buyout. Each of the Individual Defendants reviewed and/or authorized the dissemination of the Proxy, which misrepresented the above-identified material information and rendered the above-identified sections of the Proxy materially false and misleading because such sections provided a false and misleading picture of Baldacci's relationship with Iberdrola. Further, the Defendants caused or allowed the Proxy to be issued with the intention of soliciting stockholder support of the Buyout, and Individual Defendants Ignacio S. Galán and Robert Duffy personally signed the Proxy.

69.     Each of the Individual Defendants, by virtue of their roles as officers and/or directors of the Company, should have known of Baldacci's relationship with Iberdrola but negligently failed to ensure such information was disclosed in the Proxy in a non-misleading fashion, in violation of Section 14(a) and Rule 14a-9. The Individual Defendants should have known that the Proxy was materially false and misleading in regard to the above-referenced material information. After Iberdrola successfully dictated the terms of the negotiations and offered the Merger Consideration that it wanted, the Defendants utilized the materially misleading Proxy to solicit shareholders to accept the inadequate Merger Consideration.

70.     As directors and/or officers of Avangrid, the Individual Defendants had a duty to carefully review the Proxy—particularly those sections purporting to describe their own actions, relationships and beliefs—and to ensure that the Proxy did not omit material facts and contain materially misleading statements. The Individual Defendants also had a duty to know of material facts concerning the relationships between the members of the Unaffiliated Committee and

Iberdrola. Defendants thus should have known that the material information identified above had been omitted or misrepresented in the Proxy, rendering the sections of the Proxy identified above to be materially false, misleading, and/or incomplete.

71.    Avangrid is liable for violations of the Exchange Act as the issuing entity of the Proxy and based on the Individual Defendants' violation of the Exchange Act.

72.    The above-referenced information that was mispresented in the Proxy was material to Plaintiff and the Class, who were deprived of their right to cast an informed vote because such misrepresentations and omissions were not corrected prior to the vote on the Buyout and rendered the above-refenced sections of the Proxy materially false and misleading.

73.    As a direct and proximate result of the dissemination of the materially false and misleading Proxy that Defendants used to obtain shareholder approval of the Buyout, Plaintiff and the Class have suffered damages and actual economic losses (i.e., the difference between the value they received as a result of the Buyout and the true value of their shares at the time of the Buyout) in an amount to be determined at trial. By reason of the negligent acts and omissions detailed herein, Defendants are liable pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9.

**COUNT II**
**Against All Individual Defendants for Violations of Section 20(a) of the Exchange Act**

74.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

75.    The Individual Defendants acted as controlling persons of Avangrid within the meaning of Section 20(a) of the Exchange Act as alleged herein.

76.    By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the sale process described in the Proxy, the Individual Defendants had the power to influence and

control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially false and misleading.

77.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

78.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.

79.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and/or approving the Buyout. The Proxy describes the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

80.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

81.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.

82.    By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

83.     As a direct and proximate result of the Individual Defendants' conduct, Plaintiff and the Class have suffered damages and actual economic losses (i.e., the difference between the value they received as a result of the Buyout and the true value of their shares at the time of the Buyout) in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Awarding Plaintiff and the Class compensatory and/or rescissory damages sustained as a result of Defendants' wrongdoing, including, but not limited to, pre-judgment and post-judgment interest;

C.     Granting Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' fees, expert fees, and expenses;

D.     Awarding extraordinary and/or equitable relief as permitted by law, equity, and the federal statutory provisions sued upon hereunder; and

E.     Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.


Dated: January 27, 2025                    Respectfully submitted,

                                           **MONTEVERDE & ASSOCIATES PC**

                                           */s/ Juan E. Monteverde*
                                           Juan E. Monteverde (JM-8169)
                                           Miles D. Schreiner
                                           Jonathan T. Lerner
                                           The Empire State Building
                                           350 Fifth Avenue, Suite 4740
                                           New York, NY 10118
                                           Tel: (212) 971-1341
                                           Fax: (212) 202-7880
                                           jmonteverde@monteverdelaw.com
                                           mschreiner@monteverdelaw.com
                                           jlerner@monteverdelaw.com