UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                                  :
MARC GOLDSCHEIN, individually and on behalf of all    :
others similarly situated,                                         :
                                                                  :
                           Plaintiff,              :                25-CV-772 (JMF)
                                                                  :
            -v-                                    :                OPINION AND ORDER
                                                                  :
AVANGRID, INC., et al.,                            :
                                                                  :
                           Defendants.             :
                                                                  :
-------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

    In this putative class action, Lead Plaintiff Marc Goldschein brings securities fraud

claims against Avangrid, Inc. ("Avangrid") and four Avangrid directors (the "Individual

Defendants") on behalf of Avangrid's minority shareholders ("Plaintiffs").[1]  The Complaint

alleges that Defendants made material misstatements and omissions in proxy statements

soliciting support for a buyout of Avangrid's minority shareholders by Iberdrola, S.A.

("Iberdrola") in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934

("Exchange Act"), 15 U.S.C. §§ 78n(a)(1), 78t(a).  *See* ECF No. 3 ("Compl."), ¶¶ 1, 3.

Defendants now move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to

dismiss for failure to state a claim.  *See* ECF No. 25; *see also* ECF No. 26 ("Defs.' Mem."), at 1-

2.  For the reasons that follow, Defendants' motion to dismiss is GRANTED.

---

[1]     The Individual Defendants are former director and Board Chairman Ignacio S. Galán,
former director and Chief Executive Officer Pedro Azagra Blázquez, and former directors Robert
Duffy and John Baldacci.  ECF No. 3 ("Compl."), ¶ 1.

**BACKGROUND**

The following facts, taken from the Complaint, documents it incorporates, and matters of which the Court may take judicial notice, are construed in the light most favorable to Plaintiffs. *See, e.g., Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 152 (2d Cir. 2013); *see also, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (stating that a court may consider "legally required public disclosure documents filed with the SEC").

Iberdrola is a Spanish conglomerate that owns and operates utility companies around the world, including in the United States. *See* Compl. ¶¶ 25, 43. In 2008, Iberdrola acquired the American utility company Energy East Corporation ("Energy East") and reorganized it into a wholly owned subsidiary named Iberdrola USA. *See id.* ¶ 26. In 2015, Iberdrola USA acquired yet another utility, UIL Holdings Corp. ("UIL"), and renamed the combined company Avangrid, in which UIL shareholders maintained an 18.5% minority interest. *Id.* ¶¶ 27-28. Under the agreement governing the UIL acquisition (the "Shareholder Agreement"), Iberdrola retained the right to designate director nominees and fill board vacancies, *id.* ¶ 30, and it exercised its rights by appointing the Individual Defendants to Avangrid's board, including — most significantly for purposes of this case — John Baldacci, the former Governor of Maine, *see id.* ¶¶ 20-23, 31.

Baldacci's relationship with Iberdrola began in 2008, when, during Baldacci's term as Governor, Iberdrola took over Central Maine Power ("CMP") as part of its acquisition of Energy East. *See id.* ¶ 41. A year later, Baldacci led a Maine trade mission to Spain, where he met Iberdrola executives and toured the company's facilities. *Id.* ¶¶ 43-44. In 2010, following the Maine Utility Commission's approval of a new project by CMP, Baldacci met twice with the Executive Chairman of Iberdrola (and his co-Defendant in this case), Ignacio S. Galán, *id.* ¶¶ 32, 49, 51, and publicly praised "Iberdrola's investments in critical infrastructure and energy

technology," *id.* ¶ 51 (cleaned up).  In 2012, shortly after Baldacci's term as Governor ended, he joined the law firm Pierce Atwood LLP ("Pierce Atwood") as a lobbyist and advisor and remained there until 2021.  *Id.* ¶¶ 52, 54.  Iberdrola retained Pierce Atwood from at least 2015 to 2021, paying the firm at least $20 million in fees during that period.  *Id.* ¶ 54.  In 2014, Iberdrola appointed Baldacci to the board of Iberdrola USA and, after the acquisition of UIL, he was appointed director and Vice Chairman of the board of Avangrid.  *Id.* ¶ 53.  Baldacci received over $1.6 million in total compensation for his services as an Avangrid board member from 2015 to 2023 (ranging between $100,000 and $240,000 per year) and was one of the highest paid directors for almost all of those years.  *Id.* ¶ 56.  Avangrid listed Baldacci as a non-"independent" director in its public filings until 2022, after he left Pierce Atwood.  *Id.* ¶ 33.

In March 2024, Iberdrola announced its intention to acquire the minority shareholders' interest in Avangrid through a buyout transaction (the "Buyout").  *Id.* ¶¶ 2, 6.  To protect the minority shareholders, the Shareholder Agreement established a three-person committee (the "Unaffiliated Committee") comprised of "independent" Avangrid directors — including Baldacci — to negotiate the terms of the Buyout at arms-length and approve those terms before they could go out for shareholder approval.  *Id.* ¶¶ 4, 34, 37.  After several months of negotiations, the Unaffiliated Committee ultimately negotiated a cash price of $35.75 per share and voted to approve the transaction, which was subsequently ratified by the full board of Avangrid.  *Id.* ¶¶ 2, 7-8.  That left shareholder approval as the only remaining hurdle to clear.

Pursuant to Securities and Exchange Commission ("SEC") rules and the Shareholder Agreement, Avangrid filed proxy statements on August 20 and September 6, 2024 (the "Proxy Statements") that aimed to solicit shareholder support for the Buyout.  *Id.* ¶¶ 3, 9.  As relevant here, the Proxy Statements: (1) characterized the Unaffiliated Committee as being comprised of

people who were "unaffiliated with, and otherwise independent from, Iberdrola," *id.* ¶ 4, Challenged Statements 6-8; *see also id.*, Challenged Statements 5, 9, 11; and (2) did not expressly discuss or mention Baldacci's affiliations with Iberdrola, *see id.*, Challenged Statements 1, 10. On September 26, 2024, the shareholders approved the Buyout, which closed on December 23, 2024. *Id.* ¶¶ 10, 11.

On January 27, 2025, Goldschein — who purports to represent a class of Avangrid minority shareholders — filed this putative class action against Defendants, challenging the legality of the Proxy Statements that informed the Buyout. *See* ECF No. 1. Specifically, Plaintiffs allege that Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9, by making false or misleading statements and/or omitting material information in the Proxy Statements that had the effect of creating "a false and misleading picture of Baldacci's relationship with Iberdrola." Compl. ¶ 68. They further allege that the Individual Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), by failing to "prevent the issuance of the statements or cause the statements to be corrected." *Id.* ¶ 77. As noted, Defendants now move to dismiss.

## LEGAL STANDARDS

"In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 319-20 (S.D.N.Y. 2012) (citing *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)). The Court will not dismiss any claims pursuant to Rule 12(b)(6) unless the plaintiff has failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that contains "factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

More specifically, a plaintiff must allege facts showing "more than a sheer possibility that a

defendant has acted unlawfully." *Id.*  A complaint that offers only "labels and conclusions" or "a

formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

If a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [those

claims] must be dismissed." *Id.* at 570.

      To the extent that Plaintiffs allege fraud under the federal securities laws, they must also

satisfy the heightened pleading requirements of both Rule 9(b) and the Private Securities

Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(2).  To satisfy Rule 9(b), a plaintiff

generally "must '(1) specify the statements that the plaintiff contends were fraudulent,

(2) identify the speaker, (3) state where and when the statements were made, and (4) explain why

the statements were fraudulent.'"  *Anschutz Corp. v. Merrill Lynch & Co.*, *Inc.,* 690 F.3d 98, 108

(2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).  To satisfy the

PSLRA, a complaint must, "with respect to each act or omission alleged to [constitute securities

fraud], state with particularity facts giving rise to a strong inference that the defendant acted with

the required state of mind." *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d

71, 88 n.14 (2d Cir. 2017) (internal quotation marks omitted) (quoting 15 U.S.C. § 78u-4(b)(2));

*see In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 22 (S.D.N.Y. 2016) (noting that a

plaintiff "must allege facts supporting a strong inference with respect to each defendant").  The

"strong inference" must be "more than merely plausible or reasonable." *Tellabs, Inc. v. Makor*

*Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).

**DISCUSSION**

As noted, Plaintiffs allege that all Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9, by making false or misleading statements and/or omitting material information in its Proxy Statements.  *See* Compl. ¶¶ 65-73.  They further allege that the Individual Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), by controlling the violations of Section 14(a).  *See id.* ¶¶ 74-83.

Section 14(a) of the Exchange Act makes it unlawful "to solicit any proxy or consent or authorization in respect of any security" by a method that contravenes "such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78n(a)(1).  Under that authority, the SEC has promulgated Rule 14a-9, which prohibits a "proxy statement . . . containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9(a).  To state a viable claim under Section 14(a), therefore, "plaintiffs 'must show that (1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs' injury, and (3) the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.'"  *Canaan X L.P. v. MoneyLion Inc.*, 734 F. Supp. 3d 259, 266 (S.D.N.Y. 2024) (quoting *Bond Opportunity Fund v. Unilab Corp.*, 87 F. App'x 772, 773 (2d Cir. 2004) (summary order)).  Plaintiffs "must also allege that defendants acted at least with negligence in making the misrepresentation or omission."  *McIntosh v. Katapult Holdings, Inc.*, No. 21-CV-7251 (JPO), 2023 WL 5049044, at *8 (S.D.N.Y. Aug. 8,

2023) (internal quotation marks omitted).  To state a claim for control-person liability under Section 20(a), plaintiffs must, at a minimum, plead a plausible "primary violation" of Section 14(a).  *See, e.g.*, *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 356-57 (2d Cir. 2022).

The crux of Plaintiffs' Section 14(a) claim here is that Defendants' description of Baldacci in the Proxy Statements as "unaffiliated with, and otherwise independent from, Iberdrola" was false or misleading because it failed to acknowledge Baldacci's "longstanding ties to Iberdrola" that, in Plaintiffs' view, called into question his independence and ability to act as an "impartial negotiator during the Buyout."  ECF No. 30 ("Pls.' Opp'n"), at 1.  That information, Plaintiffs argue, was material to the shareholders because it would have affected their assessment of the Unaffiliated Committee's independence and the fairness of the deal process.  *See id.* at 13-14.  And it caused shareholders losses, because, had they known the truth, they likely would not have approved the Buyout at the price they did.  *Id.* at 14-20.  Defendants contest each element of Plaintiffs' claim.  The Court need not and does not address the elements of causation and scienter, however, because it agrees with Defendants that Plaintiffs fail to plausibly allege any misrepresentation or omissions in the Proxy Statements because they do not allege facts sufficient to infer that Baldacci lacked independence from Iberdrola.  And even if the facts they plead were sufficient to raise that inference, Plaintiffs fail to allege that Defendants' statements were material because information about Baldacci's role was publicly available to minority shareholders through news reports and SEC filings.  The Court will address each defect in turn.

## A. Misrepresentations / Omissions

As relevant here, a corporate director lacks independence if he "has a special relationship with a party whose interests may be adverse to those of the shareholders." *Kahn v. Wien*, 842 F. Supp. 667, 677-78 (E.D.N.Y. 1994), *aff'd*, 41 F.3d 1501 (2d Cir. 1994).[2]  To plead that a director "lacked independence" under that standard, "a plaintiff 'must allege facts supporting a reasonable inference that a director is sufficiently loyal to, beholden to, or otherwise influenced by an interested party so as to undermine the director's ability to judge the matter on its merits.'" *In re Martha Stewart Living Omnimedia, Inc. S'holder Litig.*, No. 11202-VCS, 2017 WL 3568089, at *19 (Del. Ch. Aug. 18, 2017) ("*Martha Stewart*") (quoting *In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *9 (Del. Ch. Oct. 10, 2016)).[3]  Significantly, however, "[b]are allegations that directors are friendly with . . . or have past business relationships the proponent of a transaction" are not enough to demonstrate a lack of independence.  *Id.* (internal quotation marks omitted) (quoting *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635, 649 (Del. 2014)).  Additionally, "the existence of some financial ties between the interested party and the director, without more, is not disqualifying."  *Id.* at *20 (internal quotation marks omitted) (quoting *M&F Worldwide Corp.*, 88 A.3d at 649).

---

[2]    Additionally, a corporate director lacks independence if he "has a personal stake in a corporate decision." *Kahn v. Wien*, 842 F. Supp. 667, 677-78 (E.D.N.Y. 1994), *aff'd*, 41 F.3d 1501 (2d Cir. 1994).  But Plaintiffs disclaim reliance on that prong of the standard here.  *See* ECF No. 30 ("Pls.' Opp'n"), at 6-7 (noting that it is "correct[] . . . that Plaintiffs do not allege that Baldacci had a 'personal stake' in the Buyout's outcome").

[3]    As courts confronting similar issues are wont to do, the Court looks to Delaware cases as persuasive authority in evaluating the issue of director independence because of Delaware's extensive experience evaluating such claims in the context of fiduciary duty lawsuits.  *See, e.g.*, *Vargas v. Citrix Sys., Inc.*, 716 F. Supp. 3d 1295, 1308 (S.D. Fla. 2024) (citing Delaware state court decisions when evaluating Section 14(a) claims based on a conflict of interest).

Judge Rakoff's decision in *Zappia v. Myovant Sciences Ltd.*, 708 F. Supp. 3d 486 (S.D.N.Y. 2023), *aff'd*, No. 24-253-cv, 2025 WL 338351 (2d Cir. Jan. 30, 2025), is instructive. There, the plaintiffs brought Section 14(a) claims against a pharmaceutical company — Myovant — which had been acquired by its majority shareholder — Sumitovant — in a buyout-style transaction approved by a "special" committee that played the same role as the Unaffiliated Committee here. *Id.* at 489. Like Plaintiffs here, the *Zappia* plaintiffs disputed a proxy statement's characterization of the law firm hired to represent the special committee as "independent" from Sumitovant. *Id.* at 490. They alleged that the firm was, in fact, not independent, because it had concurrently represented and previously represented firms with financial ties to Sumitovant and was also representing the firm financing the buyout transaction in an unrelated matter. *Id.* at 489-90. The court rejected those allegations as insufficient, noting that the complaint failed to "allege that [the law firm] ha[d] ever represented Sumitovant . . . or its corporate parent" and did not allege that the companies the law firm had represented were "operationally integrated" with Sumitovant in a way that would allow the court to impute the law firm's connections with those companies to Sumitovant. *Id.* at 491 (quoting *GSI Com. Sols., Inc. v. BabyCenter, LLC*, 618 F.3d 204, 211 (2d Cir. 2010)). Further, it observed that the implication of plaintiffs' claim — that the law firm lacked an incentive to secure the best price possible for minority shareholders — was belied by evidence that the "special" committee's negotiations "pushed up Sumitovant's bid from an initial offer of $22.75 per share . . . [to] $27 per share." *Id.* at 492.

Measured against these standards, Plaintiffs' allegations fall short. As discussed above, the only connections Plaintiffs allege between Baldacci and Iberdrola are that: (1) over fifteen years ago, Baldacci, in his capacity as Governor of Maine, met with Iberdrola executives a

handful of times after the firm had acquired CMP, Compl. ¶¶ 41, 44, 49-51; (2) after leaving the governorship, Baldacci worked at Pierce Atwood, a law firm that was retained by Iberdrola, *id.* ¶¶ 52, 54; and (3) over ten years ago, Baldacci joined the board of Iberdrola USA, which became Avangrid after the UIL acquisition and received six-figure annual compensation for that role, *id.* ¶¶ 53, 56.[4] These "bare allegations," without more, do not suffice. *Martha Stewart,* 2017 WL 3568089, at *20. As to Baldacci's time as Governor, Plaintiffs do not allege, for example, that he took any actions in that role that favored Iberdrola.[5] And as to his time at Pierce Atwood, they do not allege that he himself had any stake in the law firm's work on behalf of Iberdrola or even that he worked on any Iberdrola-related matters during his tenure there.[6] Finally, as to Baldacci's compensation, the Complaint alleges that he was "*a* highest paid director of [Avangrid]," Compl. ¶ 56 (emphasis added), but it provides no reason to infer that the fees he

---

[4]     Plaintiffs also argue in passing that Avangrid's designation of Baldacci as a non-independent director in its proxy statements until 2022 — when he left Pierce Atwood — is evidence that he lacked independence from Iberdrola. *See* Compl. ¶ 33; Pls.' Opp'n 5. Plaintiffs do not explain the criteria that Avangrid used to make that determination, but to the extent it was based on the rules of the New York Stock Exchange ("NYSE"), it would carry "little weight" in determining independence for purposes of Section 14(a), as "[a] board's determination of director independence under the NYSE Rules is qualitatively different from, and thus does not operate as a surrogate for, . . . analysis of independence under Delaware law" and, by extension, Section 14(a). *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 61 (Del. Ch. 2015); *see also* ECF No. 31 ("Defs.' Reply"), at 3-4.

[5]     Plaintiffs do allege that Baldacci expressed an intent "to support legislation easing investment and ownership regulations," Compl. ¶ 45, and to facilitate investment initiatives that might apply to Iberdrola, *see* Pls.' Opp'n 5-6. But they allege no facts to support an inference that he took any of those actions specifically to benefit Iberdrola.

[6]     In fact, Avangrid's April 16, 2021 Proxy Statement, which the Complaint incorporates by reference, *see* Compl. ¶ 33, appears to rule out any profit-sharing arrangement between Baldacci and Pierce Atwood. *See* ECF No. 27-5, at 39 (disclosing that "Baldacci . . . holds a salaried position as a senior advisor . . . with [Pierce Atwood] and does *not* receive profit sharing or other incentives related to the legal services provided to the company" (emphasis added)); *see also* ECF No. 26 ("Defs.' Mem."), at 18.

was paid "exceed materially what is commonly understood and accepted to be a usual and customary director's fee," *Sec. Police & Fire Pros. of Am. Ret. Fund v. Mack*, 30 Misc. 3d 663, 679 (N.Y. Sup. Ct. 2010) (internal quotation marks omitted) (quoting *Orman v. Cullman*, 794 A.2d 5, 29 n.62 (Del. Ch. 2002)), *aff'd*, 940 N.Y.S.2d 609 (N.Y. App. Div. 2012), which might support an inference that he lacked independence.  *See also* ECF No. 31 ("Defs.' Reply"), at 3.

To be sure, Plaintiffs' argument here is stronger than the one Judge Rakoff rejected in *Zappia* because they at least allege that Baldacci had *some* connections — however attenuated — with Iberdrola and that Avangrid and Iberdrola were operationally integrated.  *See* Compl. ¶ 35 (describing the two firms' "operational enmeshment").  But, contrary to Plaintiffs' suggestion, combining stale and attenuated connections does not endow them with "cumulative significance."  Pls.' Opp'n 9.  Instead, what is needed are connections that suggest a "special relationship."  *Wien*, 842 F. Supp. at 677.  And Plaintiffs here fail to allege that Baldacci had a significant relationship — let alone a "special relationship" — with Iberdrola during either his time in the Governor's mansion or at Pierce Atwood.  *See* Compl. ¶¶ 41, 44-47, 49-54, 56; *see also In re Mindbody, Inc. Secs. Litig.*, 489 F. Supp. 3d 188, 215 (S.D.N.Y. 2020) (holding that plaintiffs failed to plead a "conflict of interest" because they failed to allege how a business relationship "could have caused" a party to have "divided loyalties").  Moreover, as in *Zappia*, Plaintiffs' assertion that Baldacci and, by extension, the Unaffiliated Committee lacked an incentive to secure the best price possible for minority shareholders appears to be belied by the Supplement to the September 6, 2024 Proxy Statement, which states that the Unaffiliated Committee's negotiations caused Iberdrola to raise its offer price from $34.25 per share to

$35.75 per share with continuing dividends through closing. *See* ECF No. 27-2, at 4, 15; Defs.' Mem. 5.[7]

Plaintiffs' argument to the contrary relies heavily on the Second Circuit's decision in *Wilson v. Great American Industries*, 855 F.2d 987 (2d Cir. 1988), which they describe as "on point, controlling authority" supporting their position. Pls.' Opp'n 7. But Plaintiffs "read[] too much into too little" by divorcing *Wilson* from the facts of that case. *Zappia*, 708 F. Supp. 3d at 493 (internal quotation marks omitted). *Wilson* involved the acquisition of a firm called Chenango Industries, Inc. ("Chenago") by another company called Great American Industries, Inc. ("GAI"). *See* 855 F.2d at 989. One of Chenango's directors was also its General Counsel and represented the company in the acquisition. *See id.* at 990, 994. Chenango's proxy statement, however, failed to disclose that he had personally represented several of the most important directors of GAI and that his firm had represented them for decades. *See id.* at 989, 993. Plaintiffs alleged, and the Second Circuit held, that Chenango's failure to disclose that fact constituted a violation of Section 14(a) because, without it, the proxy statement "necessarily implied that [that director was] acting with complete loyalty to Chenango and its shareholders." *Id.* at 994. Those facts are a far cry from Baldacci's relationship with Iberdrola. Unlike the director in *Wilson*, Baldacci is not alleged to have represented any of the directors of Iberdrola (or the firm itself) during his tenure as Governor, while employed at Pierce Atwood, or at any time thereafter. Moreover, Baldacci was not acting as legal counsel to any party to the Buyout, which is a role that comes with its own attendant set of duties of loyalty to clients. *See United States v. Mendez*, 750 F. Supp. 3d 327, 330 (S.D.N.Y. 2024) ("It is elementary that an attorney

---

[7]    A court may consider the contents of "legally required public disclosure documents filed with the SEC" when adjudicating a motion to dismiss. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

owes his client a duty of undivided loyalty." (cleaned up)). In short, far from supporting Plaintiffs' claim here, *Wilson* reveals the shortcomings in that claim.

In sum, "without more," *Martha Stewart*, 2017 WL 3568089, at *20 (internal quotation marks omitted), Plaintiffs' bare allegations do not "nudge[] their claims" that Baldacci lacked independence from Iberdrola "across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570. For that reason alone, Plaintiffs' Section 14(a) claim must be and is DISMISSED against all Defendants.

## B. Materiality

In any event, even if Plaintiffs did plausibly allege that Defendants' statements about Baldacci's independence were misleading, their claims would fail on materiality grounds. "In the context of a proxy statement, a fact is material 'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.'" *Resnik v. Swartz*, 303 F.3d 147, 151 (2d Cir. 2002) (quoting *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 (1991)). Accordingly, the Second Circuit has held that, "[t]o succeed on a Rule 14a-9 material omission claim, the plaintiff must show that there was a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Seinfeld v. Gray*, 404 F.3d 645, 650 (2d Cir. 2005) (internal quotation marks omitted). And, as relevant here, the "total mix" of information includes information "in the public domain and facts known or reasonably available to the shareholders." *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) (internal quotation marks omitted).

Here, assuming *arguendo* that Defendants' statements regarding Baldacci's independence were misleading, those statements were not material because all of the information alleged in the

Complaint regarding the relationship between Baldacci and Iberdrola was publicly available —
in news reports and other public filings with the SEC.  In fact, Plaintiffs were able to allege the
information in their Complaint "precisely because it *was* reasonably available to the public."
*Zappia*, 708 F. Supp. 3d at 494; *see also In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*,
272 F. Supp. 2d 243, 250 (S.D.N.Y. 2003) ("Plaintiff's own Complaint demonstrates that
information concerning companies in which the Fund might invest . . . was publicly available.
. . .  Plaintiff therefore cannot show that such information was concealed from the markets or
from Fund investors.").  Significantly, Plaintiffs do not dispute that the information alleged in
their Complaint was publicly available to shareholders.  Nevertheless, they contend, the
information significantly altered the total mix of information (and was therefore material)
because it was in "sporadic news reports," *N.J. Carpenters Health Fund v. Royal Bank of
Scotland Grp., PLC*, 709 F.3d 109, 127 (2d Cir. 2013), rather than "widely reported in readily
available media," *United Paperworkers*, 984 F.2d at 1199, and was pieced together only through
the diligent efforts of Plaintiffs' counsel.  *See* Pls.' Opp'n 11-12.

      But that contention does not pass the plausibility threshold.  Baldacci's meetings with
Iberdrola executives and his statements regarding the company were the public actions of a
Governor.  They were featured in press releases and reported in Maine news sources and, thus,
were already in the public domain.  *See* Defs.' Mem. 15 (listing the sources of the information in
the complaint); *see also Bettis v. Aixtron SE*, No. 16-CV-00025 (CM), 2016 WL 7468194, at
*12-13 (S.D.N.Y. Dec. 20, 2016) (dismissing claims based on allegedly omitted information
published in two articles in industry and region-specific publications); *Zappia*, 708 F. Supp. 3d at
494 (similar).  Additionally, Avangrid's public filings with the SEC disclosed the information on
which Plaintiffs rely regarding Baldacci's employment with Pierce Atwood and the payments

that firm received from Iberdrola. *See* Defs.' Mem. 16; *see also* Compl. ¶¶ 54, 56. Plaintiffs

maintain that these prior disclosures do not count because shareholders had no reason to look

beyond the August 20 and September 6, 2024 Proxy Statements in the context of the Buyout.

*See* Pls.' Opp'n 12-13. But whether shareholders had "reason to look" at a document is not the

standard for materiality in this Circuit. Instead, the question the Court must ask is whether the

facts were "reasonably available" to the shareholders such that they could be considered part of

the "total mix" of information. *United Paperworkers*, 985 F.2d at 1199. Public filings that

provide full disclosure and are subsequently distributed to shareholders certainly fit the bill.[8]

       Neither of the cases upon which Plaintiffs rely to argue otherwise — *N.J. Carpenters* and

*United Paperworkers* — requires a different result. In both cases, the defendants unsuccessfully

argued that their misstatements and omissions in proxy statements were immaterial because of

the existence of news reports that only partially covered the extent of their alleged misconduct.

*See N.J. Carpenters*, 709 F.3d at 127 (noting that "neither article disclose[d] what the [plaintiff]

allege[d], namely that [the defendant] had abandoned its published underwriting guidelines");

*United Paperworkers*, 985 F.2d at 1199-1201 (determining that articles reporting on a handful of

pollution cases against a firm were insufficient to put shareholders on notice as to the extent of

the firm's environmental problems when it was defending over forty civil environmental

actions). Here, by contrast, the articles and prior disclosures included all of Plaintiffs'

allegations. As a matter of law, therefore, those allegations could not significantly alter the total

---

[8]     Plaintiffs argue that there is *no* publicly available information that could cure Defendants' "affirmatively . . . false[]" statements regarding Baldacci's lack of independence. Pls.' Opp'n 13. That argument lacks any binding legal support and, in any case, fails because, as noted, the statements in question were not misleading, let alone affirmatively false.

mix of information available to the shareholders.  For this reason too, Plaintiffs' Section 14(a) claim would also fail and have to be dismissed.

## CONCLUSION

In short, Plaintiff's Section 14(a) claim fails as a matter of law for at least two independent reasons: Plaintiffs fail to plausibly allege any misleading statement and, to the extent they do, the statement was not material.  It follows that their Section 20(a) "controlling person" claim also fails and must be dismissed.  *See, e.g.*, *Rombach*, 355 F.3d at 177-78; *In re Bristol-Myers Squibb Co. CVR Sec. Litig.*, 658 F. Supp. 3d 220, 238 (S.D.N.Y. 2023).

That leaves only Plaintiffs' cursory request for leave to amend.  *See* Pls.' Opp'n 27. Although leave to amend should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), it is "within the sound discretion of the district court to grant or deny leave to amend," *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019).  Here, the problems with Plaintiffs' dismissed claims are substantive, so amendment would be futile.  *See, e.g., Roundtree v. NYC*, No. 19-CV-2475 (JMF), 2021 WL 1667193, at *6 (S.D.N.Y. Apr. 28, 2021) (collecting cases).  Moreover, Plaintiffs do not suggest that they are in possession of facts that would cure the problems with their dismissed claims.  *See, e.g., Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014) ("A plaintiff need not be given leave to amend if [it] fails to specify how amendment would cure the pleading deficiencies in [its] complaint."); *accord TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014).  Finally, the Court granted Plaintiffs leave to amend in response to Defendants' first motion to dismiss and explicitly warned that they would "not be given any further opportunity to amend the complaint to address issues raised by the motion to dismiss."  ECF Nos. 28, 29.  "Plaintiff's failure to fix deficiencies in its previous pleadings is alone sufficient ground to deny leave to amend . . . ."

*Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 415 (S.D.N.Y. 2013) (collecting cases).  Accordingly, Plaintiffs' request for leave to amend is DENIED.

One final housekeeping matter remains.  Under the PSLRA, the Court is required to "include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion."  15 U.S.C. § 78u-4(c)(1).  Because all legal claims and defenses presented throughout this litigation were nonfrivolous under existing law and all factual contentions had evidentiary support or were reasonably based on belief or a lack of information, no sanctions under Rule 11 are warranted.

The Clerk of Court is directed to terminate ECF No. 25, to enter judgment for Defendants consistent with this Opinion and Order, and to close the case.

SO ORDERED.

Dated: December 22, 2025
New York, New York

_____
JESSE M. FURMAN
United States District Judge